IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JPMorgan Chase Bank, N.A.,

      Plaintiff,

v.

G7 Productivity Systems, Inc.,

      Defendant.

Case No. 2:08-cv-339

Judge Graham

Magistrate Judge Kemp

<u>Opinion and Order</u>

      Plaintiff JPMorgan Chase Bank, N.A. brings this action concerning an online check-writing service known as Qchex.  JPMorgan alleges that Qchex was made available in 2005 by Neovi, Inc., a now-bankrupt company and alleged alter ego of defendant G7 Productivity Systems, Inc.  According to the complaint, Qchex was vulnerable to frauds committed by third parties who independently gained access to account information of bank customers and then used Qchex to write unauthorized checks out of those customers' accounts.  JPMorgan alleges that it suffered losses of at least $315,000 in connection with the payment and deposit of unauthorized Qchex checks.

      Before the court are two motions.  The first is G7's motion to dismiss for improper venue or, alternatively, to transfer venue to the United States District Court for the Southern District of California, where G7 has its principal place of business.  The second is JPMorgan's motion for partial summary judgment that a judicial decision rendered in a lawsuit brought by the Federal Trade Commission (FTC) against Neovi and G7 in the Southern District of California has a preclusive effect in this action.

      For the reasons stated below, both motions are denied.

I.      Background

   A.      Prior Litigation

In 2006 JPMorgan filed a lawsuit in this court against Neovi regarding the Qchex service.  See JPMorgan Chase Bank, N.A. v. Neovi, Inc., Case No. 2:06-cv-95 (S.D. Ohio).  Prior to any rulings on the merits, that suit was stayed and later terminated after Neovi filed for bankruptcy.

The FTC brought suit in 2006 in the Southern District of California against Neovi, G7, Thomas Villwock (Neovi's owner), and James Danforth (Neovi's vice-president and G7's executive vice-president).  See FTC v. Neovi, Inc. et al., Case No. 06-cv-1952 (S.D. Cal.).  The FTC alleged that defendants' Qchex online service violated the unfair acts and practices provision of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

The district court granted partial summary judgment to the FTC.  See FTC v. Neovi, Inc., 598 F.Supp.2d 1104 (S.D. Cal. 2008).  It found that Neovi had made available, managed, and marketed the Qchex system and that G7 had printed and mailed checks for Qchex.  The court found that defendants had actual knowledge of the high level of fraud related to Qchex but failed to implement adequate verification measures to combat unauthorized check-writing:

> Defendants' business practice significantly facilitated fraudulent activity.  Defendants used their website and check creation expertise to convert consumers' raw data into a negotiable instrument that matched U.S. banking regulations when printed.  Defendants also e-mailed the checks, printed the checks using Neovi's "print service center," and mailed the checks.  Further, as the FTC alleged, they created and delivered checks without a reasonable level of verification at the request of Qchex customers -- in many instances, fraudsters.  The evidence shows that the launch of Qchex.com was a "dinner bell" for fraudsters and resulted in a high number of accounts frozen for fraud, and the large number and high value of checks (about fifty percent of the value of all Qchex checks) written on those accounts. Defendants knew of the high level of fraud from their own files and the complaints, and . . . they chose to continue to operate without sufficient verification measures.

Neovi, 598 F.Supp.2d at 1114-15.

The district court further held that Neovi and G7 were jointly and severally liable because they had operated as a "common enterprise."  Id. at 1116.  The court found that both companies were controlled by Villwock and Danforth, that they shared office space and expenses, and that their

"operations, finances, employees, physical infrastructure, and business strategy were tightly interwoven." Id.

The Ninth Circuit affirmed the judgment of the district court. On appeal, defendants argued that the causation element of 15 U.S.C. § 45(a) could not be satisfied because it was third parties, not defendants, who were engaging in the unauthorized issuance of checks. The Ninth Circuit firmly rejected this argument, calling it "spin" that "ignored[d] the fact that Qchex created and controlled a system that facilitated fraud and that the company was on notice as to the high fraud rate." FTC v. Neovi, Inc., 604 F.3d 1150, 1155 (9th Cir. 2010). The court held that it was sufficient for liability under the FTC Act that defendants, once knowing of the high level of fraud, continued to create and deliver checks without reasonable verification measures.

## B. The Current Lawsuit

JPMorgan filed suit in this court against G7, alleging that G7 is the alter ego of Neovi and is liable for two types of losses suffered by JPMorgan. First, JPMorgan alleges that it sustained losses of at least $165,000 in making payment on checks that were drawn out of its customers' accounts without authorization. Second, JPMorgan alleges that it sustained losses of at least $150,000 in crediting customers' accounts for unauthorized checks that were deposited into those accounts and for which the drawee banks refused to make payment.

The original complaint claimed that Neovi was liable under § 3-403(a) of the Uniform Commercial Code, which provides that an unauthorized signature is ineffective except as to the one who makes the unauthorized signature. JPMorgan alleged that Neovi had "signed" the checks within the meaning of the U.C.C. JPMorgan further alleged that G7 was liable as Neovi's alter ego.

In the amended complaint, JPMorgan reasserts the alter ago theory, and also alleges that G7 itself violated § 3-403 of the U.C.C. G7 "signed" the checks, JPMorgan alleges, when it printed checks and placed on them facsimile signatures (or other markings in the signature field) to indicate that the check was authentic.

**II.     Motion to Transfer Venue**

G7 has moved to dismiss for improper venue or, in the alternative, to transfer venue to the Southern District of California. G7 states that it is a California corporation with its principal place of business in San Diego. It has no offices in Ohio. The company employs twenty-two people and produces software and office supplies such as paper, ink, and envelopes. See Danforth Decl., ¶ 2.

G7 argues simply that the action must be dismissed for improper venue because G7 does not reside in this district. Under the venue statute, a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

This argument fails to account for § 1391's provision concerning the residency of corporations. Corporations are deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. §1391(c)(2)." In its response brief, JPMorgan asserts that G7 is subject to personal jurisdiction in this judicial district. JPMorgan submits evidence showing that the Qchex system drew on the accounts of at least six JPMorgan customers residing in the Southern District of Ohio. See Lambert Decl., ¶ 5 and Exs. A-F. JPMorgan further submits evidence demonstrating that from 2000 to 2008 G7 made sales of $162,000 to over 4000 Ohio customers. See Def.'s Responses to Interrog. Nos. 8 and 9.

G7 has not responded to JPMorgan's assertions regarding personal jurisdiction. Under Ohio's long-arm statute, a court may exercise personal jurisdiction over a person who transacts any business in Ohio or who contracts to supply goods or services in Ohio. O.R.C. § 2307.382(A)(1), (2). Based on the unrebutted evidence of record, the court finds that JPMorgan has made a

4

sufficient preliminary showing that G7 is subject to personal jurisdiction in Ohio, and thus venue is proper in this judicial district under 28 U.S.C. § 1391.

G7 next argues that this action should be transferred to the Southern District of California under 28 U.S.C. § 1404(a). "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Applying § 1404(a) is a two-step process: (1) the proposed transferee court must be one in which the action could have been brought, and (2) the balance of convenience and the interests of justice must favor transfer. See Kay v. Nat'l City Mortg. Co., 494 F.Supp.2d 845, 849–50 (S.D. Ohio 2007). The moving party bears the burden of demonstrating that transfer under § 1404 is proper. Id. There is no dispute here that this action could have been brought in the Southern District of California, where G7 has its principal place of business.

Turning to the second part of the analysis, a district court has discretion to make transfer determinations on a case-by-case consideration of convenience and fairness. See Reese v. CNH America LLC, 574 F.3d 315, 320 (6th Cir. 2009). The court may consider many convenience factors, including: (1) plaintiff's choice of forum, (2) the parties' contacts with the forum, (3) the connection between the plaintiff's cause of action and the forum, (4) convenience of the parties and witnesses, (5) availability of compulsory process to compel attendance of an unwilling non-party, (6) ease of access to sources of proof, and (7) any differences in the costs of litigation in the two forums. See Kay, 494 F.Supp.2d at 850 (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n. 6 (1981)); Centerville ALF, Inc. v. Balanced Care Corp., 197 F.Supp.2d 1039, 1049-50 (S.D. Ohio 2002). Public interest factors to be considered include the pendency of related litigation in another district, judicial economy, the transferee judge's familiarity with the facts and circumstances of the case, and the need to promote the fair and consistent resolution of related cases. See Kay, 494 F.Supp.2d at 850; Centerville, 197 F.Supp.2d at 1049.

G7's lone argument for transfer is that G7 is a "small business" which cannot afford to transport its witnesses and evidence to Ohio for trial. See Danforth Decl., ¶¶ 4-6 (stating that G7's

5

witnesses and records are located in Southern California). The court recognizes that as between the two parties, JPMorgan has greater means than G7 to litigate out of district. Nonetheless G7 has not demonstrated that litigating the matter in this judicial district would be a specific hardship. "[A] generalized assertion by a defendant that witnesses reside in, and documents are located in, the proposed transferee district, is generally insufficient to support a change of venue. . . . [T]he defendant must show a specific hardship involved in transporting documents to the plaintiff's chosen district, . . . and must also show that witnesses (usually third party witnesses, rather than employees of the defendants) are unwilling to attend a trial in that forum. See Lassak v. American Defense Systems, Inc., No. 2:06-cv-1021, 2007 WL 1469408, at *2 (May 18, 2007) (internal citations omitted).

G7 fails to identify who, if any, of the likely witnesses are not G7 employees and are also unwilling to attend trial. Moreover, the declaration of G7's own corporate principal acknowledges that much if not all of the evidence regarding "the Qchex database and e-mail, spreadsheets and e-mail databases, assorted Word documents, website programs and HTML pages, financial accounting databases and contact management databases" is in the form of "electronic documents" on G7's computer systems. See Danforth Decl., ¶6. This weighs against a transfer of venue. See Harris v. BNP Paribas, No. 2:09-cv-691, 2010 WL 1817248, at *4 (S.D. Ohio. May 6, 2010) ("[T]he Court does not believe that the documentary proof in this case will be particularly voluminous or that it could not be placed into electronic format (if it does not exist in that format already), thus reducing or eliminating any burden of transporting it from place to place. As a result, this factor does not weigh in favor of transfer."). For its part, JPMorgan states that its witnesses and evidence are located in Ohio. Transfer at best would serve only to shift the inconvenience from one party to the other. In such a case, transfer is improper. See Harris, 2010 WL 1817248, at *2 ("[I]f a change of venue serves merely to shift the inconvenience from the plaintiff to the defendant, a change of venue is improper.").

The court thus concludes that plaintiff's choice of forum is entitled to "considerable weight," see Lassak, 2007 WL 1469408, at *2, and G7's motion to transfer venue is denied.

### III. Motion for Partial Summary Judgment

#### A. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S.

451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### B. Discussion

JPMorgan contends that it is entitled to judgment as a matter of law on two issues: (1) that G7 "signed" the Qchex checks within the meaning of the U.C.C., and (2) that G7 is Neovi's alter ego. JPMorgan argues under the doctrine of collateral estoppel that the findings and conclusions made in the FTC v. Neovi lawsuit have a preclusive effect here and compel summary judgment on those issues.

To bar relitigation of an issue under the collateral estoppel doctrine, four requirements must be met:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

Bies v. Bagley, 535 F.3d 520, 522 (6th Cir. 2008).

### 1. Whether G7 "Signed" the Checks

Under U.C.C. § 3-403(a) (adopted in Ohio at O.R.C. § 1303.43(A)), "an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value." The accepted rule is that "the unauthorized signature, while it is wholly inoperative as that of the person whose name is signed, is effective to impose liability upon the signer or to transfer any rights that the signer may have in the instrument." U.C.C. § 3-403(a), cmt. 2. "A signature may be made (i) manually or by means of a device or machine, and (ii) by the use of any name, including a trade or assumed name, or by a word, mark, or symbol executed or adopted by a person with present intention to authenticate a writing." U.C.C. § 3-401(b); O.R.C. § 1303.41(B).

JPMorgan argues that the decision in the FTC case collaterally estops G7 from demonstrating that it did not sign the unauthorized checks. At issue in the FTC case was whether the Qchex system constituted an unfair practice that caused or was likely to cause substantial injury to consumers. FTC v. Neovi, Inc., 604 F.3d 1150, 1155 (9th Cir. 2010). The district court found, and the Ninth Circuit affirmed, that Qchex's "creation and delivery of unverified checks" caused substantial injury to consumers. Id.

JPMorgan admits that the issue of whether G7 signed the checks under U.C.C. § 3-403 is different from the ultimate issue that was raised, litigated, and determined in the FTC case. Even so, JPMorgan contends that sufficient "subsidiary findings" were made in that case to satisfy the collateral estoppel doctrine. The Ninth Circuit and district court both described the Qchex system as requiring G7 to print the checks. When G7 printed the checks, it included either the user's facsimile signature (if the user chose to upload a facsimile signature) or "bank accepted legal language in the signature field to tell a recipient that the check issuer authorized the check being deposited." FTC v. Neovi, Inc., 598 F.Supp.2d 1104, 1109 (S.D. Cal. 2008). JPMorgan argues that G7's printing of facsimile signatures or other bank-accepted markings constituted "signing" the checks "by means of a device or machine." U.C.C. § 3-401(b).

JPMorgan is correct that a subsidiary finding in a judicial decision may have a preclusive effect in a second suit, even if the two cases reached different ultimate issues. For instance, JPMorgan cites Spence v. TRW, Inc., 92 F.3d 380 (6th Cir. 1996), where plaintiff brought a claim under the Fair Credit Reporting Act. In a prior action for defamation, a state court had held that certain statements made by the defendant were accurate. The Sixth Circuit held that the state court's determination of accuracy precluded the plaintiff in the second suit from showing that the same statements violated the FCRA, under which a plaintiff must prove that a statement is inaccurate. Spence, 92 F.3d at 382.

The case at hand is readily distinguishable from Spence. In Spence the state court's determination of accuracy squarely applied in the subsequent suit – though the two suits had different causes of action, both required a showing that the defendant's statements were factually

9

inaccurate. Here, liability in the FTC action did not hinge on whether G7 signed the checks. The Ninth Circuit held that the "creation and delivery" of checks without reasonable verification procedures was the practice that was unfair and likely to substantial injure to consumers. G7's actionable conduct was that it "did everything necessary to physically make the check and get it to its intended destination." Neovi, 598 F.Supp.2d at 1109; see also Neovi, 604 F.3d at 1154-55 (noting that G7 printed and mailed the checks to payees). Nowhere did the courts find that G7 had signed the checks. The courts stated that it was users who supplied their signatures by uploading them or by otherwise sufficiently providing authorization such that G7 would impose "bank accepted legal language in the signature field." Indeed, in a later decision denying a motion for reconsideration, the district court expressly declined to import the U.C.C.'s standards into an action under the FTC Act because the U.C.C.'s definitions are more technical than those of the FTC Act. See FTC v. Neovi, Inc., No. 06-cv-1952, 2009 WL 56130, at *3 n. 6 (S.D. Cal. Jan. 7, 2009) (refusing to use the U.C.C.'s definition of "check creation").

For JPMorgan's "subsidiary finding" argument to work here, the mere placement or printing by G7 of the user's facsimile signature (or the legal language) on the check must count as "signing" under the U.C.C. That is, the factual finding in the FTC case that G7 printed the facsimile signature on the check must compel the legal conclusion that G7 signed the checks for purposes of the U.C.C. JPMorgan cites no case law authority to support such a proposition; it merely cites the U.C.C. provision that a signature may come "by means of a device or machine." U.C.C. § 3-401(b). But simply because a signature is in an acceptable form does not mean that it can be attributed to G7. A check is "signed" by one who has the "present intention to adopt or accept a writing" -- in this case the Qchex user. See U.C.C. §1-201(37). The courts in the FTC case never made any findings regarding G7's intentions to adopt or accept the checks. The only findings on the matter made clear that it was the users who deliberately supplied input data for the checks that G7 would then print in rote fashion. See Neovi, 598 F.Supp.2d at 1109.

10

Accordingly, the court finds that collateral estoppel does not apply here because the precise issue of whether G7 signed the checks within the meaning of the U.C.C. was not raised, litigated, and determined in the FTC case.

### 2. Whether G7 and Neovi were Alter Egos

The court reaches the same conclusion as to the alter ego issue. Under the FTC Act, interrelated companies and individuals may be held jointly and severally liable if they operated as a "common enterprise" in committing an unfair practice. See FTC v. J.K. Publications, Inc., 99 F.Supp.2d 1176, 1202 (C.D. Cal. 2000) (citing cases). Neovi and G7 were found to have operated a common enterprise in the FTC case and were thus held jointly and severally liable. See Neovi, 598 F.Supp.2d at 1116. The district court found that Neovi and G7 had separate articles of incorporation and by-laws, but jointly participated in Qchex and "shared office space, employees, payroll funds, and other expenses." Id. Villwock and Danforth exerted control over both companies, and the companies' business strategies and marketing were "tightly interwoven," in that Neovi managed the Qchex system and G7 provided printing services to users who wished to print a paper check. Id.

The issue of whether Neovi and G7 were interrelated and engaged in a common enterprise for purposes of the FTC Act is not the same issue as whether the two entities were alter egos. The standard that the district court applied in determining if Neovi and G7 were interrelated for purposes of the FTC Act is less stringent that the test for alter ego liability. Under California law (which both parties agree should apply to this issue), the alter ego doctrine requires a "unity of interest and ownership between the corporation and its equitable owner" such that "separate personalities of the corporation and the shareholder do not in reality exist." Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523, 538-39, 99 Cal.Rptr.2d 824, 836 (Cal. App. Ct. 2000). Courts may consider many factors, including: commingling of funds and assets of the two entities, holding out one entity as liable for the debts of the other, identical equitable ownership in the two entities, inadequate capitalization, disregard of corporate formalities, identical directors and officers, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the

11

other.  Id. (citing cases).  Because the test is stringent, "[a]lter ego is an extreme remedy, sparingly used."  Id.[1]

Moreover, the subsidiary factual findings on which the district court based its conclusion that Neovi and G7 were engaged in a common enterprise do not compel the legal conclusion here that they were alter egos.  Though there is overlap in the factors to be considered under both inquires, the findings in the FTC case do not cover all of the factors of the alter ego inquiry.  For instance, the district court in the FTC case made no finding as to who owns G7, and it did not discuss whether one entity was held liable for the debts of the other.  It is unclear whether Neovi or G7 conducted any business or produced any products beyond that which was related to Qchex.  The district court found that G7 "produces software, ink, and paper for sale to U.S. retailers and consumers."  Neovi, 598 F.Supp.2d at 1107.  Thus, the district court's findings do not foreclose the possibility that G7 sold products to consumers other than Qchex users and that G7's only point of interrelated business with Neovi was the Qchex service.  Further, the district court noted that Neovi and G7 observed corporate formalities in terms of maintaining separate articles of incorporation and by-laws.

In sum, the district court's findings in the FTC case leave ample room for G7 to establish in this case that it was not Neovi's alter ego.  Accordingly, it would be inappropriate to grant summary judgment on collateral estoppel grounds as to the alter ego issue.

**IV.    Conclusion**

Accordingly, G7's motion to dismiss for improper venue or, alternatively, to transfer venue (doc. 17) is DENIED.  JPMorgan's motion for partial summary judgment (doc. 28) is DENIED.

　　　　　　　　　　　　　　　　　　　　　　　s/ James L. Graham
　　　　　　　　　　　　　　　　　　　　　　　JAMES L. GRAHAM
DATE: December 5, 2012　　　　　　　　　　　United States District Judge

---

[1] In a later decision holding the defendants in the FTC case in contempt, the district court likened the defendants' conduct to acting "in active concert or participation" with each other."  FTC v. Neovi, Inc., No. 06-cv-1952, 2012 WL598 F.Supp.2d 1104, 11169 (S.D. Cal. 2008).